# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| RYAN FINLEY, BRAD FINLEY, and<br>PERRY QUALITY SERVICES, INC., | )<br>)<br>) |
| Appellants, | )<br>) |
| vs. | ) Case No. 12-CV-609-JED-TLW<br>) |
| ATLAS COMPUTERS, INC.,<br>MILOS MILENKOVIC, | ) Bankruptcy Case No. 07-11665-M<br>)<br>) |
| Appellees. | ) |

## REPORT AND RECOMMENDATION

Before the undersigned United States Magistrate Judge for a Report and Recommendation is an appeal of the bankruptcy court's order approving a compromise in a fraudulent transfer action within a Chapter 7 bankruptcy case. (Dkt. # 4 at 545-70).[1] Appellants raise three issues in their appeal. (Dkt. # 15). For the reasons that follow, the undersigned RECOMMENDS that the District Court **AFFIRM** the bankruptcy court's order.

## FINDINGS OF FACT

**Background Information**

Appellants are creditors of the debtor Atlas Computers, Inc. ("Atlas"). Milos Milenkovic ("Milenkovic"), an electrical engineer, started Atlas in 1998 with two other individuals, but at all times relevant to this action, Milenkovic was the sole owner. (Dkt. # 4 at 1052). Atlas built and

---

[1] The appellate record is contained at (dkt. # 4). Because the appellate record is not consistently numbered, the undersigned will refer to the appellate record as (dkt. #4 at ___), using the page number assigned by the CM/ECF system. The trial exhibits were submitted to the Court on CD and will be referenced by their trial exhibit number. Attachments within those exhibits are noted in [ ]. Exhibits will be identified as follows: Finley (for the creditors Ryan and Brad Finley and their company, Perry Quality Services, Inc.); Defendants (for Dominion Corporation, Dominion Communication, LLC d/b/a Atlas Broadband, and Sokolosky, the defendants to the fraudulent transfer action); and Trustee.

serviced computers, provided networking services, and provided wireless broadband internet to rural customers. (Dkt. # 4 at 1053).

In 2003, Atlas needed money. (Dkt. # 4 at 1054). An attorney and customer named Noble Sokolosky ("Sokolosky") began giving money to Atlas. (Dkt. # 4 at 662-64, 1054). The money was used to purchase equipment, fund payroll, and pay debts. (Dkt. # 4 at 664, 1054, 1063). Between 2003 and 2006, Sokolosky gave Atlas almost $700,000.00. (Dkt. # 4 at 664-65, 1056; Trustee's Ex. 6 [Ex. 1]). On February 15, 2007, Milenkovic and Sokolosky reduced their arrangement to writing, in the form of a promissory note in the amount of $718,503.07. (Finley Ex. 2). Milenkovic and Sokolosky also executed a security agreement granting Sokolosky a security interest in Atlas's accounts receivable and other intangibles; inventory; machinery, equipment, furniture, and fixtures; proceeds; and documents and other similar items. (Defendants' Ex. 2).

While Atlas was engaged in business and taking regular loans from Sokolosky, Atlas also was engaged in a relationship with appellants ("the Finleys"). Although the record does not reveal the full history between the Finleys and Atlas, the record does indicate that Brad Finley worked for Atlas at one time. (Dkt. # 4 at 763). Atlas continued to do business with the Finleys and their company, Perry Quality Services, Inc. ("Perry"). (Dkt. # 4 at 739). Again, the details of the arrangement between the Finleys and Atlas are not clear, but the Finleys eventually sued Atlas. (Dkt. # 4 at 709-13). That litigation was ongoing in 2007. Id. The Finleys claim that Sokolosky threatened to bankrupt Atlas unless the Finleys settled the case on Sokolosky's terms. (Dkt. # 4 at 847-48; Dkt. # 15).

On June 1, 2007, Atlas filed a trade name, Advanced Networking Systems, Inc., with the Oklahoma Secretary of State. (Defendants' Ex. 6 [Ex. 5 and 6]). On June 4, 2007, Sokolosky

filed a foreclosure action in Rogers County, Oklahoma, even though Atlas was located in Tulsa County, Oklahoma. (Finley Ex. 1, 12). That same day, Atlas entered an appearance in the foreclosure and waived service of process. (Finley Ex. 3). The Rogers County court entered an order and judgment on the foreclosure on June 5, 2007, and an amended judgment on June 6, 2007. (Finley Ex. 5-7). By June 18, 2007, the foreclosure sale had been held, and Sokolosky had bid the amount of his judgment to purchase the assets of Atlas. (Defendants' Ex. 3). Sokolosky accepted those assets as payment in full of the promissory note. Id. Sokolosky had also created a new company, Dominion Corporation, and transferred the assets to a subsidiary, Dominion Communications, which began doing business as Atlas Broadband. (Dkt. # 4 at 666, 668). Atlas Broadband provided internet services to rural areas, using the same type of technology that Atlas had used. (Dkt. # 4 at 706-07, 1089). At the evidentiary hearing, Milokevic testified that Atlas Broadband had retained a significant number of Atlas's former customers. (Dkt. # 4 at 1104).

After the foreclosure sale, Atlas filed for bankruptcy on August 27, 2007. (Finley Ex. 12). The petition states that Atlas has no assets and $1,260,712.66 in liabilities. (Finley Ex. 12). Steven W. Soulé ("the Trustee") was appointed to serve as trustee.

**Fraudulent Transfer Action and Motion to Compromise**

After some investigation into the events leading to the bankruptcy filing, on August 25, 2009, the Trustee filed a fraudulent transfer action against Dominion Corporation, Dominion Communications, LLC, and Sokolosky ("the FTA defendants"). (Dkt. # 4 at 49, 55-60). The Trustee's action was based on the timing of the transfer of assets through foreclosure. (Dkt. # 4 at 55-60). After extensive discovery, the Trustee filed a motion to compromise on May 26, 2011. Id. The Trustee proposed that the bankruptcy court approve a settlement of the fraudulent transfer action. Id. Under the terms of the proposed compromise, the FTA defendants would pay

3

$55,000.00 in monthly installments over a six-month period. (Dkt. # 4 at 57). Additionally, the FTA defendants would waive any and all claims against Atlas and its bankruptcy estate, and the Trustee would assign "a potential claim for contribution that the bankruptcy estate may have against [the Finleys] for debts allegedly owed by the Finleys to the Debtor based on the payment by the Debtor of indebtedness to a bank (the "Contribution Claim")." (Dkt. # 4 at 57). The proposed compromise would not constitute an admission of liability on the part of the FTA defendants. Id.

The Finleys objected to the proposed compromise. (Dkt. # 4 at 63-66). The Finleys claimed that the proposed compromise was "not a fair and equitable amount" and "not in the best interest of the estate." (Dkt. # 4 at 64). The Finleys requested an evidentiary hearing and the right to conduct limited discovery on "the value of the assets wrongfully acquired by the Defendants at the time of the wrongful conduct and the current value of such assets." Id. The Finleys claimed that discovery was necessary because the Trustee had not conducted "certain limited discovery" requested by the Finleys. Id.

The bankruptcy court heard multiple discovery disputes during the discovery period preceding the evidentiary hearing on the motion to compromise. (Dkt. # 4 at 183, 228, 248, 485-502, 512-15). In each instance, the Finleys sought discovery from Sokolosky. Id. The bankruptcy court denied the requests for additional discovery, stating that the discovery was not relevant to the limited issue before the court: "whether a settlement or compromise is fair and equitable and in the best interest of the estate" and should be approved. (Dkt. # 4 at 492-93).

Following the discovery period, the bankruptcy court held an evidentiary hearing on the motion to compromise.

4

**Evidentiary Hearing on the Motion to Compromise**

The hearing took place on May 10-11, 2012. (Dkt. # 4 at 613-46, 651-881, 920-1112).

The Trustee

The Trustee testified that he filed the fraudulent transfer action with the understanding that, if he succeeded in proving the fraudulent transfer, he could either recover "the property transferred or the value of the property transferred," based on its value at the time of the transfer. (Dkt. # 4 at 953, 957). He stated that he preferred to recover the value of the property, rather than the property itself. (Dkt. # 4 at 957-58). Recovery of the property itself would require the Trustee to liquidate the property to cash to pay to creditors, and liquidation required some expense. (Dkt. # 4 at 958, 988-89).

The Trustee had hired an appraiser named Litchfield to value the assets that were transferred during the foreclosure ("the Litchfield appraisal"). (Dkt. # 4 at 959-62). The appraiser inspected some of the equipment and discussed the assets with Milekovic, the sole owner of Atlas. (Dkt. # 4 at 963). The appraiser ultimately valued the property at $164,645.00.[2] (Dkt. # 4 at 962). The Trustee also reviewed a second appraisal, which valued the assets at $6,095.00.[3] At some point, the Trustee learned "that there were perfected liens against the – some of the property that was transferred." (Dkt. # 4 at 969). The Trustee testified that those liens impacted his valuation of the property. Id.

---

[2] The appraisal was reviewed during the Trustee's testimony, but it was not admitted as an exhibit. (Dkt. # 4 at 921, 963).

[3] The second appraisal was also reviewed during the Trustee's testimony but was not admitted. The Court accepted the Trustee's testimony on the second appraisal, not for the truth of the matter asserted (the value of the assets), but for the purpose of understanding the Trustee's thought process and the evidence reviewed in deciding to seek a settlement of $55,000.00. (Dkt. # 4 at 962-65).

The Trustee took into account additional considerations regarding the valuation of the property after meeting with the FTA Defendants (Dkt. # 4 at 969-70). He testified that he "had multiple discussions with the defense counsel regarding potential deductions and issues relating to my analysis of valuation. Some of it had to do factually with my analysis; other, I would say would have had to do with settlement negotiations." (Dkt. # 4 at 970). The FTA Defendants' valuation of the business was between $30,000.00 and $47,056.00, which reflected the FTA Defendants' arguable deductions regarding the value of the assets and some deduction that the Trustee "considered as part of the settlement and compromise." (Dkt. # 4 at 970-74). The Trustee specifically testified that he did not necessarily agree with the FTA Defendants' valuation or rely on it, but he took it into consideration when proposing the compromise to the bankruptcy court. (Dkt. # 4 at 973, 1029). He had not retained an expert in economic evaluation to evaluate Atlas as an ongoing business because he did not believe that it was necessary. (Dkt. # 4 at 990-91). In his opinion, Atlas ceased doing business on the date of the bankruptcy filing. (Dkt. # 4 at 1001-02).

The Trustee further testified that he initially expected the value of the business to be much higher than the $164,645.00 in the Litchfield appraisal. (Dkt. # 4 at 975). As he gathered additional information, however, he determined that the property itself was not as valuable as he originally believed. (Dkt. # 4 at 975-76). Additionally, as the Trustee learned more about the business, he learned that Milenkovic "was the brains behind the operations and that he was – without him, this company probably wasn't worth whatever it was possibly worth." (Dkt. # 4 at 1038). Milenkovic was not bound to Atlas by an employment contract, so the Trustee could not require Milenkovic to stay and work for Atlas. (Dkt. # 4 at 1038).

Finally, the Trustee testified that he considered the strengths and weaknesses of his case against the FTA Defendants as well as the cost of litigating the case in reaching his conclusion that a $55,000.00 compromise was reasonable. (Dkt. # 4 at 982-83, 986-90). The Trustee stated that he anticipated a cost of $10,000.00 to $20,000.00 to litigate the fraudulent transfer action. (Dkt. # 4 at 982-83). The Trustee was relatively comfortable with the facts of the case and the strength of his argument, but he stated that he never tried a case with "no doubt" about the outcome. (Dkt. # 4 at 986-90). He disagreed with the Finleys' attorney that this case was a "no brainer." (Dkt. # 4 at 987). For example, the Trustee testified that because Sokolosky was not an officer or director, the Trustee would have to prove that Sokolosky was "a person in control" under a "catch-all insider definition." (Dkt. # 4 at 988). He believed that the FTA Defendants could have made a reasonable argument on that issue. Id.

The Trustee was aware that the Finleys strongly disagreed with the valuation of the property. (Dkt. # 4 at 992). He testified that he had recalled speaking to the Finleys or their counsel on several occasions about the case. (Dkt. # 4 at 993). He stated that he would have encouraged them to provide information to support their position but that he had not received any documentation. (Dkt. # 4 at 994-95). The Trustee did not recall scheduling a meeting with the Finleys prior to the settlement, but he reiterated that he "certainly encouraged" them to speak with him about the case. (Dkt. # 4 at 993).

<u>Milos Milenkovic</u>

Milenkovic testified that Atlas originally started as a computer building and networking business, but that he expanded to broadband provision in 2001. (Dkt. # 4 at 1053). He continued to provide those services until the foreclosure. (Dkt. # 4 at 1054). He borrowed money from Sokolosky between 2003 and 2006 on an as-needed basis. Id. The money was used to purchase

7

equipment, fund payroll, and pay debts. (Dkt. # 4 at 1063). The loans were not secured when they were made, but he later entered into a promissory note and security agreement with Sokolosky. (Dkt. # 4 at 1056). Atlas could not meet its obligations, so Sokolosky foreclosed on the promissory note. (Dkt. # 4 at 1056-57). Sokolosky purchased all of Atlas's assets at the foreclosure by pledging the amount of the foreclosure judgment. (Dkt. # 4 at 1057). After the foreclosure, Atlas could not operate because it no longer had any assets. Id.

Milenkovic testified that Sokolosky was not an officer, director, or owner of Atlas; however, he acknowledged that he spoke to Sokolosky daily about the Atlas business. (Dkt. # 4 at 1055-56). He also knew that Sokolosky planned to file the foreclosure action ahead of time. (Dkt. # 4 at 1064). Counsel for the Finleys attempted to link the timing of the foreclosure to a settlement demand in the Finleys' litigation against Atlas, but Milenkovic testified that he could only make "his best guess" that the lawsuit was the reason for the foreclosure. (Dkt. # 4 at 1064-65). The bankruptcy court judge also admonished counsel that the evidentiary hearing was limited. (Dkt. # 4 at 1066).

With respect to the assets of the business, Milenkovic testified that since the foreclosure, Atlas Broadband has purchased new equipment and retired some of the old equipment it obtained from Atlas. (Dkt. # 4 at 1106). Milenkovic also testified that some of the technology had changed, making the purchase of new equipment necessary. (Dkt. # 4 at 1106-07). He acknowledged that Atlas Broadband operated out of the same building that housed Atlas. (Dkt. # 4 at 1104). Currently, Atlas Broadband provided service to 3300-3500 customers. (Dkt. # 4 at 1110). At the time of foreclosure, Atlas had between 1200 and 1400 customers. (Dkt. # 4 at 1088). Milenkovic estimated that half of Atlas's old customers were now customers of Atlas Broadband. (Dkt. # 4 at 1104).

8

Noble Sokolosky

Sokolosky testified that he was an attorney, although he considered himself "pretty much retired." (Dkt. # 4 at 662). He became involved with Atlas when they installed internet at his home and office. (Dkt. # 4 at 663-64). He was intrigued by the concept of the business and began loaning money to Atlas because the "little company was not bankable." (Dkt. # 4 at 664). Sokolosky stated that he did not intend to loan such a significant amount of money. Id. His wife insisted that he stop loaning money to Atlas in fall 2006. (Dkt. # 4 at 664-66). Sokolosky said that he formed Dominion Communications at that time and proceeded to secure the loans with a promissory note and security agreement. (Dkt. # 4 at 666).

When Atlas did not pay the note, Sokolosky initiated foreclosure proceedings. (Dkt. # 4 at 666-67). He testified that nobody attended the sale, so he bid his judgment and bought the assets of Atlas. (Dkt. # 4 at 668). Sokolosky stated that he had already planned to sell the assets to Dominion Communications (doing business as Atlas Broadband), so he "wanted [the bid] to be as high as it could to get our basis and those assets high to be able to shelter any revenue that the company made." Id. Sokolosky testified that he was never an officer, director, shareholder, or consultant with Atlas. (Dkt. # 4 at 670-71). Aside from being a private lender, Sokolosky was also a commercial and residential customer. (Dkt. # 4 at 671).

On cross-examination, Sokolosky stated that Atlas's financial position before the foreclosure was precarious. (Dkt. # 4 at 673-76). Sokolosky mentioned a debt owed to the IRS, his own loan, and the ongoing litigation with the Finleys. Id. Counsel for the Finleys asked whether the foreclosure action was a retaliatory response to the Finleys' million-dollar settlement offer. (Dkt. # 4 at 675-76). Sokolosky testified that he found the offer laughable, but if the offer

9

was presented in 2007, he could have thought that bankruptcy was a good way for Atlas to avoid incurring attorney fees and advised Milenkovic accordingly. (Dkt. # 4 at 676).

He admitted that he had told the Finleys to work out a deal with Atlas, or he would foreclose on his promissory note and take all of Atlas's assets. (Dkt. # 4 at 709-12). He denied, however, that he had initiated the foreclosure proceeding under Atlas's newly-filed trade name as a means to hide it from the Finleys. (Dkt. # 4 at 680-90). Instead, Sokolosky testified that he had used the trade name so that Atlas's customers would not be concerned about a loss of service. Id.

### Brad Finley

Brad Finley testified that, at one time, he was involved with Atlas, referring to his interest as "our part of the company." (Dkt. # 4 at 849). He testified that Sokolosky threatened to bankrupt Atlas in March 2006. (Dkt. # 4 at 848-49). Mr. Finley stated that Sokolosky was using his leverage to attempt to settle the dispute that the Finleys had with Atlas. Id. When the parties could not reach agreement, Sokolosky followed through with his threats. (Dkt. # 4 at 850).

Brad Finley also testified that he and his brother had set up a meeting with the Trustee to discuss his "side of the case." (Dkt. # 4 at 847-48). Before the meeting, the Trustee sent notice of the proposed settlement, so the meeting did not take place. Id. Mr. Finley testified that he was not aware that the Trustee had been negotiating with Sokolosky until the proposed settlement was announced. Id.

### Ryan Finley

Ryan Finley gave similar testimony regarding the planned meeting with the Trustee. (Dkt. # 4 at 789-91). He had planned to travel from Tennessee to "go over our viewpoint of the bankruptcy case and to inform the Trustee what our perspective was on value and on – and just our viewpoint as creditors." (Dkt. # 4 at 790-91). At the time the meeting was scheduled, the

case had not settled. (Dkt. # 4 at 791). When Ryan Finley learned that the case had settled, the meeting was canceled. Id.

The bankruptcy court also permitted Ryan Finley to give expert testimony over the objection of the FTA Defendants. (Dkt. # 4 at 795-98). Ryan Finley had worked as a certified public accountant for twenty years and had spent fifteen years performing financial analyses for companies for the purpose of determining the potential rate of return for investors.[4] (Dkt. # 4 at 791-95). The bankruptcy court found that Ryan Finley had been properly designated as an expert witness. (Dkt. # 4 at 795-98). The court further stated that it was "not concerned about him testifying and giving an opinion on the basis of lack of expertise. That's a matter that can be explored on cross-examination . . . ." (Dkt. # 4 at 796-97).

Using his experience, Ryan Finley testified that, in his opinion, Atlas was worth $1.2 million at the time of the foreclosure. (Dkt. # 4 at 801). He reached that opinion using three different valuation methods: (1) the income approach; (2) the direct capitalization approach; and (3) the replacement cost approach. Id. He also applied a fourth formula that he calls a "double-check," in which he reviews net cash flow for a year and extrapolates the investment amount required to obtain a 10-12% return on investment. (Dkt. # 4 at 804).

For the direct capitalization findings, Mr. Finley testified that the direct capitalization rate varies from industry to industry. (Dkt. # 4 at 801). Mr. Finley had applied the rate for the telecom industry, which he believed most closely reflected Atlas's business. Id. He testified that the capitalization rate was "a quick way to value money" by taking "net income divided by your

---

[4] For six of those fifteen years, Mr. Finley worked for a company that acquired and built golf courses. (Dkt. # 4 at 792). He led a team that performed financial analyses to determine "whether we could invest a certain dollar amount and meet the returns" that his company required before acquiring a new course. Id. For the remaining time, Mr. Finley worked for a second company, "running financial analysis and doing feasibility studies and market studies on whether the value of this company or the required investment meets their return criteria." (Dkt. # 4 at 793).

assets or your market value." (Dkt. # 4 at 802). Inverting the formula, dividing net income by the capitalization rate provides "an estimated market value." Id. Mr. Finley testified that his valuation using the direct capitalization formula complied with the standards set forth by the American Appraiser Association. Id.

Mr. Finley used the Atlas Broadband balance sheet from 2007 (Finley Ex. 13) to conduct the replacement cost analysis. (Dkt. # 4 at 802-03). He stated that the balance sheet listed assets of $1,060,000.00 and that he would also consider the "future benefits of cash flow from the customer contracts." (Dkt. # 4 at 804).

For the third approach, Mr. Finley considered recent, comparable sales. Id. He testified that the foreclosure sale and the transfer from Sokolosky to Dominion Corporation constituted two transfers within the relevant time period. Id. Mr. Finley believed that this valuation was the least reliable because neither sale was "an arm's-length transaction" and neither sale had "any market considerations given to that." (Dkt. # 4 at 805). In his opinion, those sales did not reflect "fair market value." Id.

Mr. Finley also considered the years that Atlas Broadband was in business after 2007. Id. He reviewed deposition testimony and the live testimony given earlier in the hearing and created a spreadsheet reflecting the value of the company. (Dkt. # 4 at 805-07). He stated that the spreadsheet was relevant for two reasons. First, the information available after 2007 was more complete and helped him "fill in the gaps." (Dkt. # 4 at 807). Second, in his opinion, Atlas Broadband, despite the legal maneuverings, was simply an extension of Atlas. (Dkt. # 4 at 806). Based on the information in the spreadsheet, Atlas Broadband was worth $1.2 million in 2007 and 2008, $1.7 million in 2009, and $2.4 million in 2010. (Dkt. # 4 at 809).

12

On cross-examination, Mr. Finley testified that he had prepared the spreadsheet the previous night. (Dkt. # 4 at 809). He had previously reviewed some materials and made some notes, but he had only started preparing his expert opinion in earnest on "Monday, maybe." Id. He did not value the assets that were transferred because "that's not the best way to measure value." He also defended the basis for his opinions, stating that his attempts to obtain additional information regarding the value of the company through discovery were refused. (Dkt. # 4 at 815-17).

## ANALYSIS

On appeal, the Finleys raise three points of error. First, they claim that the bankruptcy court's decision was not an informed decision based on an objective evaluation of developed facts, using the four factors courts consider in determining whether a proposed compromise should be accepted. (Dkt. # 15). Second, they argue that the bankruptcy court committed several evidentiary errors that require reversal. Id. Third, the Finleys argue that denying their motion to compel discovery constituted reversible error. Id. The Trustee and the FTA Defendants contend that the bankruptcy court properly considered the narrow issue before it: whether the settlement was fair, equitable, and in the best interest of the bankruptcy estate. (Dkt. # 19). The Trustee and the FTA Defendants also raise a procedural challenge to the Finleys' second and third points of error. Id. They claim that the Finleys failed to adequately brief those issues by failing to cite any authority, thereby waiving those issues on appeal. Id.

### Factors Required for Consideration of a Proposed Compromise

A bankruptcy court may approve a proposed compromise; however, the court's decision "must be an informed one based upon an objective evaluation of developed facts." Reiss v. Hagmann, 881 F.2d 890, 892 (10th Cir. 1989) (citing Protective Comm. for Indep. Stockholders

13

of TMT Trailer Ferry, Inc. v. Anderson, 390 U.S. 414, 424, 434, 88 S. Ct. 1157, 20 L.Ed.2d 1 (1968)). A bankruptcy court's decision is reviewed for "abuse of discretion." Id. (citation omitted). The Tenth Circuit Court of Appeals Bankruptcy Appellate Panel has established four factors for bankruptcy courts to consider in approving a proposed compromise: (1) the likelihood of success on the merits; (2) possible difficulty in collecting a judgment; (3) "the complexity and expense of the litigation;" and (4) "the interests of creditors in deference to their reasonable views." In re Kopexa Realty Venture Co., 213 B.R. 1020, 1022 (10th Cir. BAP 1997) (citations omitted).

In this case, the FTA Defendants stipulated that collecting a judgment would not be an issue. (Dkt. # 4 at 519, 567). The bankruptcy court made additional findings on the other three factors. (Dkt. # 4 at 559-69). The bankruptcy court found that the Trustee would likely succeed against the FTA Defendants in establishing constructive fraud under the applicable bankruptcy statute. (Dkt. # 4 at 559-61). See also 11 U.S.C. § 548 (setting forth the elements of constructive fraud in a fraudulent transfer action). The court also found that the Trustee's estimate of litigation costs at $10,000.00-$20,000.00 was reasonable. (Dkt. # 4 at 567). Finally, the court found that, given its conclusion that the settlement was reasonable, the Finleys' objection, which was also the sole objection to the proposed compromise, could not outweigh the evidence supporting approval of the settlement. (Dkt. # 4 at 567-68).

The Finleys do not object to most of the court's findings. The Finleys' real objection is to the bankruptcy court's analysis of the nature and value of the property at issue in the fraudulent transfer action. The Finleys have taken the position that the foreclosure and ensuing bankruptcy filing were fraudulent and that the bankruptcy court should value the property transferred in light of those facts. The recovery in a fraudulent transfer action, however, is limited to "the property

14

transferred, or, if the court so orders, the value of such property." 11 U.S.C. § 550(a). Thus, whatever the bankruptcy court thought about the underlying facts, the bankruptcy court properly held that it could not consider those facts. Moreover, in this case, the property transferred was determined by the list of assets identified in the foreclosure sale. The Finleys have not contested the list of assets, nor have they presented a list of assets that they believe should be defined as the property transferred in this case.

Accordingly, the undersigned recommends a finding that the bankruptcy court did not abuse its discretion in finding that the factors weighed in favor of accepting the proposed compromise.

**Evidentiary Rulings**

The Finleys contend that the bankruptcy court made three evidentiary errors that require reversal. (Dkt. # 15). First, the Finleys contend that the bankruptcy court improperly permitted Sokolosky's counsel to ask leading questions during Sokolosky's direct examination. Id. Second, the Finleys argue that the bankruptcy court should have admitted a tape of a telephone message in which Sokolosky threatened to bankrupt Atlas. Id. Finally, the Finleys argue that the bankruptcy court erred in overruling their objection that Sokolosky's testimony was non-responsive on the basis that the Finleys' counsel was not questioning Sokolosky at the time. Id.

The Finleys have cited no authority to support their claims of error. Id. The Trustee and the FTA Defendants contend that the failure to cite authority constitutes a waiver of those issues. (Dkt. # 19).

Inadequate Briefing

When reviewing decisions of the bankruptcy court, the district court sits as an appellate court. See 28 U.S.C. § 158(a). See also Stern v. Marshall, ___ U.S. ___, 131 S.Ct. 2594, 2604,

15

180 L.Ed.2d 475 (2011) (holding that "[p]arties may appeal final judgments of a bankruptcy court in core proceedings to the district court, which reviews them under traditional appellate standards."). As such, the Finleys' brief was required to comply with the Federal Rules of Appellate Procedure, which governs, among other things, the form and substance of briefs. Federal Rule of Appellate Procedure 28(a)(9) requires the argument section of an appellate brief to contain "appellant's contentions and the reasons for them, with citations to the authorities and parts of the record on which the appellant relies" and "a concise statement of the applicable standard of review." Fed. R. App. P. 29(a)(9)(A) and (B). Where the appellant's brief violates the rules, the court has the option to dismiss the appeal. See MacArthur v. San Juan County, 495 F.3d 1157, 1160-61 (10th Cir. 2007) (citations omitted). However, the court may also exercise its discretion to review the case on the merits. See id. at 1161. Because the undersigned is issuing a report and recommendation, the merits of the evidentiary arguments are addressed below.

Merits of the Evidentiary Issues

"The admissibility of evidence is reviewed under an abuse of discretion standard." In re Sharp, 361 B.R. 559, 565 (10th Cir. BAP 2007). See also Wright-Simmons v. City of Oklahoma City, 155 F.3d 1264, 1268 (10th Cir. 1998) (applying the abuse of discretion standard to all "evidentiary rulings"). Further, the abuse of discretion must "result in 'manifest injustice to the parties.'" Id. (quoting Thompson v. State Farm Fire & Cas. Co., 34 F.3d 932, 939 (10th Cir. 1994)). Appellants are required to make "a clear showing that they suffered prejudice and that the ruling was 'inconsistent with substantial justice' or affected their 'substantial rights.'" Id. (citing Coletti v. Cudd Pressure Control, 165 F.3d 767, 773 (10th Cir. 1999)).

*Leading Question*

The Finleys claim that the leading question at issue related to whether the moneys given to Atlas were loans or whether Sokolosky invested the money in an attempt to take control of Atlas. (Dkt. # 15 at 14). The answer to that question, within the context of the limited issue before the bankruptcy court, relates to the issue regarding the Trustee's likelihood of success on the merits. Because the bankruptcy court found that the Trustee would probably be successful on the merits and, therefore, would probably be able to establish constructive fraud, appellants were not prejudiced by the manner in which Sokolosky's attorney asked the question. Even if the question were an inappropriate leading question, the bankruptcy court found in the Finleys' favor on the ultimate issue related to the question. Thus, the Finleys were not prejudiced by the leading question, and the bankruptcy court's ruling with regard to the question was not inconsistent with substantial justice and did not affect any of the Finleys' substantial rights.

*Admissibility of the Telephone Message*

The Finleys also argue that the bankruptcy court should have admitted a telephone message in which Sokolosky threatened to bankrupt Atlas unless the Finleys settled their lawsuit against Atlas. (Dkt. # 15 at 14-16). The Finleys contend that admitting the telephone message "would have effectively impeached the Defendant and, equally importantly, would have undermined the position of the Trustee and the Defendant" by revealing "that the foreclosure and bankruptcy were a ploy. . . ." (Dkt. # 15 at 16). The court initially denied the Finleys' attempt to introduce the telephone message because counsel had failed to lay a proper foundation. (Dkt. # 4 at 709). Counsel for the Finleys then proceeded to ask a series of questions regarding the telephone message, and Sokolosky admitted to making each of the statements contained in the telephone message. (Dkt. # 4 at 709-13). At one point, on an "asked and answered" objection,

17

the bankruptcy court noted that Sokolosky had admitted to making each of the statements contained in the telephone message. (Dkt. # 4 at 711-12). After questioning Sokolosky thoroughly on those statements, counsel for the Finleys moved on to a different line of questioning and did not attempt to admit the recording again. (Dkt. # 4 at 712).

The undersigned finds no error in the bankruptcy court's initial ruling that additional foundation was required. The bankruptcy court even hinted at the questions necessary to establish foundation. (Dkt. # 4 at 709). Moreover, Sokolosky readily admitted to the substance of those statements, although he disputed that he had made them in a telephone message. (Dkt. # 4 at 709-13). Accordingly, the substance of the "threats" was before the court. Further, because counsel for the Finleys did not attempt to admit the telephone message after laying a foundation, the bankruptcy court could not have committed error in failing to admit it.

*Non-responsive Answers*

The Finleys' third evidentiary objection is a single objection to Sokolosky's direct questioning by his own attorney. (Dkt. # 4 at 769-70; Dkt. # 15 at 17-18). The Finleys objected to one of Sokolosky's answers as non-responsive. Id. The bankruptcy court overruled the objection because counsel for the Finleys had not asked the question. Id. The question put to Sokolosky concerned the general differences between the services performed by Atlas and those performed by Atlas Broadband. (Dkt. # 4 at 769-70). The undersigned cannot ascertain any basis for determining that Sokolosky's answer, even if non-responsive, had any bearing on the Finleys' substantive rights. Additionally, *McCormick on Evidence* states that the bankruptcy court's ruling is consistent with the traditional interpretation of the rules, although some trial courts do permit both parties to move to strike an answer as non-responsive. See Kenneth S. Broun, *McCormick on Evidence* § 52, at 254 nn. 6–7 (7th ed. 2013).

**Motion to Compel**

Finally, the Finleys argue that the bankruptcy court erred in denying their motion to compel discovery related to Sokolosky and Atlas Broadband's financial documents. (Dkt. # 15). Again, the Finleys claim that this information is vital to the question of whether the money Sokolosky gave to Atlas was a loan or an investment in the company. Id. And again, that issue relates to the question of whether the Trustee was likely to prevail on the merits by establishing actual or constructive fraud. The bankruptcy court found that the Trustee was likely to prevail on the merits; therefore, the Finleys were not harmed by the bankruptcy court's denial of the motion to compel discovery, even if the denial was improper.

## RECOMMENDATION

This case has a complex factual background, which the bankruptcy court noted in its decision to approve the settlement. That background, however, had very little bearing on the issue before the bankruptcy court. The bankruptcy court properly limited its inquiry to the review of the proposed compromise in the fraudulent transfer action. The bankruptcy court did not abuse its discretion in finding that the value of the assets, as indicated by the Trustee, was accurate and that the proposed compromise of $55,000.00 was reasonable under the circumstances. The points of error raised by the Finleys are without merit. For these reasons, the undersigned RECOMMENDS that the Court **AFFIRM** the bankruptcy court's order approving the compromise in the fraudulent transfer action.

## OBJECTION

The District Judge assigned to this case will conduct a *de novo* review of the record and determine whether to adopt or revise this Report and Recommendation or whether to recommit the matter to the undersigned. As part of his review, the Judge will consider the parties' written

objections to this Report and Recommendation. A party wishing to file objections to this Report and Recommendation must do so by July 25, 2013. See 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b). The failure to file written objections to this Report and Recommendation may bar the party failing to object from appealing any of the factual or legal findings in this Report and Recommendation that are accepted or adopted by the District Court. See Moore v. United States, 950 F.2d 656 (10th Cir. 1991); and Talley v. Hesse, 91 F.3d 1411, 1412-13 (10th Cir. 1996).

SUBMITTED this 11th day of July, 2013.

*[signature]*

T. Lane Wilson
United States Magistrate Judge